# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

№ 12-cv-1762 (JFB) (ETB)
_____

SHERRY BUCH,

Plaintiff,

VERSUS

FARMINGDALE STATE COLLEGE, NYS DIVISION OF HUMAN RIGHTS,
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Defendants.
_____

**MEMORANDUM AND ORDER**
March 4, 2013
_____

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Sherry Buch ("plaintiff" or "Buch") brings this action pursuant to Title I of the Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112-12117 ("ADA"), as amended, against her former employer Farmingdale State College ("defendant" or "the College"), as well as the administrative agencies with which she initially filed her charge of discrimination, *i.e.*, the New York State Division of Human Rights ("NYSDHR") and the Equal Employment Opportunity Commission ("EEOC"). Plaintiff's complaint was *sua sponte* dismissed against the NYSDHR and the EEOC, with prejudice, pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(iii), and against the College, without prejudice, pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii). Plaintiff subsequently filed an amended complaint against the College.

The College moves to dismiss plaintiff's claims on three grounds: (1) for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure due to the College's Eleventh Amendment immunity from liability under Title I of the ADA; (2) for failure to comply with Rule 8 of the Federal Rules of Civil Procedure's pleading requirements; and (3) for failure to state a claim (in particular, a claim for disability discrimination and a claim for retaliation) upon which relief may be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

For the reasons set forth herein, the Court grants defendant's motion to dismiss. In particular, because the Eleventh Amendment bars federal suit against the

College under Title I of the ADA, the case must be dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction.

I. BACKGROUND

A. Facts

The following facts are taken from plaintiff's amended complaint and are not findings of fact by the Court. Instead, the Court assumes these facts to be true for purposes of deciding the pending motion to dismiss and will construe them in a light most favorable to plaintiff, the non-moving party.

1. Work Begins

Plaintiff began working at the College in approximately 2006. (Am. Compl. at 15.)[1,2] Plaintiff worked there for approximately four years. (*Id.* at 12.)[3] During this time, plaintiff alleges that she experienced discriminatory conduct including termination of employment, failure to promote, failure to accommodate her disability, unequal terms and conditions of employment, and retaliation. (*Id.* at 3.) Plaintiff asserts that she was discriminated against on account of her disability, which she identifies as "emotional limitations." (*Id.*)

Plaintiff states that she "was quite regularly misunderstood and treated as though [she] was an incorrigible delinquent to be singled out and given strict and severe guidelines and protocols which were different than most all [sic] the other employees on the campus . . . ." (*Id.* at 6.) Plaintiff directs the Court, both in her amended complaint and in an attachment to her complaint, to various incidents exemplifying this discriminatory treatment, which culminated in her suspension and subsequent termination from her position.[4]

---

[1] The first three pages of plaintiff's amended complaint are numbered. However, plaintiff includes several attachments, all of which are unnumbered. These attachments provide significant additional factual background. For simplicity's sake, and to avoid confusion, the Court adopts ECF's numbering system as to all pages of the amended complaint and its corresponding attachments.

[2] In her amended complaint, plaintiff asserts that she started working at the College in 2007, (Am. Compl. at 6), but in an attachment to the amended complaint, plaintiff states she began working there in 2006, (*id.* at 15.) Plaintiff confirms in her opposition motion to defendant's motion to dismiss that her 2007 start date as stated in her amended complaint was an error. (*See* Pl.'s Opp'n Mot. at 2.)

[3] Prior to her employment at the College, plaintiff had been on "governmental SSI benefits program for the past thirty years" due to disability; plaintiff believed at the time she accepted her employment with the College that it would similarly take care of her. (Am. Compl. at 15.) Plaintiff additionally states that, at some point in time, she worked at the New York State Lottery. (*Id.* at 16.) However, it is not clear whether plaintiff was employed at the Lottery before or during her employment at the College. Her amended complaint states that she was employed there for a year, (*id.* at 16), and her opposition motion states she was not working at the College in February 2009, but "was working at the New York State Lottery under a probationary period of a promotion at the time," (Pl.'s Opp'n Mot. at 8.) While there, plaintiff says she never received a single Notice of Discipline, and was only reprimanded on one occasion. (Am. Compl. at 15-16.) Plaintiff further asserts that "[a]ll my infractions were related to my anxiety disorder and they were all relatively minor." (*Id.* at 17.) For this reason, plaintiff contends that the punishment she received for her alleged infractions while employed at the College "was outrageously severe and in excess of what was needed to get [her] on track." (*Id.*)

[4] Plaintiff's attachments to her amended complaint include an undated letter that plaintiff submitted to the EEOC. (Am. Compl. at 11.) The letter reflects plaintiff's frustration with a prior EEOC ruling in which the EEOC found against plaintiff. (*Id.* (stating "[t]hey found against me; and I believe it was an absolute case of improper and inadequate investigation and conclusions and work on my behalf").) In the letter, plaintiff requests that the EEOC conduct an investigation into her allegations

### 2. Tardiness

A repeated source of contention for plaintiff at work was time, specifically, her arrival time, time spent during lunch breaks, and time off for illness. Plaintiff admits that she "struggled fiercely with a lateness problem due to my emotional difficulties and limitations," for which she contends she "was regularly brought up on charges" instead of receiving compassion. (*Id.* at 6.) Additionally, plaintiff states that she, unlike her co-workers, had to email her supervisor and inform him or her of her arrival time at work, when she left for lunch, when she returned from lunch, and when she was leaving work for the day. (*Id.* at 21.) Plaintiff states she was the only employee at the College required to provide such updates, and that these "harsh rules" constituted bullying. (*Id.*)

Plaintiff points to specific instances of tardiness, which she contends represent her employer's pettiness for marking her down when a blind eye was turned towards other employees who did the same. For instance, plaintiff states that over the course of a six month period, she was marked late for a total time of 4.17 hours, which shows that management had "it in for" her. (*Id.* at 27.)

In particular, plaintiff notes that management would compile a list of the exact time for which she was late (*e.g.*, two minutes, three minutes, or four minutes late). (*Id.*)

Plaintiff questions a report issued by the College in which she was marked late approximately 67 times. (*Id.* at 29.) Plaintiff says this figure is "highly exaggerated and false." (*Id.*) Moreover, plaintiff argues that the 67 figure is not accurate, as she at times would be marked late, even if she was only a few minutes late to work. (*Id.* at 27, 29.) Plaintiff asserts that others in the workplace were not treated the same way or disciplined in the same fashion if and when they were late. (*Id.* at 29.)

Plaintiff recalls that she was marked five minutes late to work on September 30, and on January 18, two minutes late. (*Id.* at 32.)[5] Plaintiff states that she also was marked late on November 15, December 15, and January 4, but says she believes she had prior personal engagements on those dates. (*Id.*)[6,7] Plaintiff admits that she was late on January 12, but says it snowed that day, and so "was not a clear-cut base of blatant tardiness." (*Id.*) Furthermore, plaintiff argues that it was wrong for Human Resources to have marked her as tardy on the snowfall date because she "made the effort and came into work when much or most of the campus workforce did not even bother to come in." (*Id.*) Human Resources included the late-arrival snow day in a Notice of Discipline subsequently brought against plaintiff. (*Id.*)

---

of discrimination and unfair treatment at the College. (*Id.*)

Another attachment to the amended complaint is a letter from plaintiff to the State Division of Human Rights, dated October 30, 2011. (*See id.* at 12-54.) Plaintiff's letter makes clear at the outset that she intends for it to serve as her "reply and response back to the Response of the State University of New York College at Farmingdale . . . to the above-captioned complaint." (*Id.*) Plaintiff's amended complaint and corresponding attachments, however, do not include the document from the College to which she is replying. Thus, several of her responses are difficult to understand in the absence of context. Indeed, the exact years and timeline of events is not clear from the record, and the Court does its best to parse the various events together in a seemingly chronological order.

---

[5] Plaintiff does not include the years corresponding to these dates in her pleadings.
[6] It is not clear from plaintiff's allegations the precise years of these dates of lateness.
[7] Plaintiff's personal engagements included having to visit her lawyer to drop off paperwork and having to attend a court date. (Am. Compl. at 32.)

Regarding lunch breaks, plaintiff admits that she was brought up on formal charges for arriving late from lunch on four occasions. (*Id.* at 21.) However, she contends that she "would have been more than happy to have sat with her [supervisor] and worked out something between [the two of them] rather than being brought up on formal charges" for her lunch arrival tardiness. (*Id.*) Given the lack of communication between plaintiff and her supervisor, however, plaintiff contends this was not a reasonable option for her, as her supervisor was "not amenable to being decent to me and working things out." (*Id.*)

Plaintiff addresses two alleged lunch breaks for which her employer marked her as tardy. Plaintiff states she did not decide to take these breaks, but rather, participated for a few minutes "with the people celebrating somebody in the department's promotion." (*Id.* at 33.) Following her participation in these celebrations, plaintiff proceeded to take her lunch break.

Plaintiff also addresses another late charge, dated January 18 (year unstated). (*Id.*) Plaintiff states that she was thirty minutes late from her lunch break because she went to a funeral, which she had permission to attend and for which she was instructed to return no later than the end of her normal break. (*Id.*)[8]

Plaintiff admits to being late from lunch on another date (unstated as to when), but asserts that this "happens to everyone from time to time." (*Id.* at 33.) However, while others can work out any such tardiness with their supervisor, plaintiff says she was "disciplined and penalized for minor infractions that were ignored in others." (*Id.*)

Plaintiff admits that she had to take time off due to illness, but states that she is and has "always been a person who gets colds and flus [sic] and bronchial asthma trouble more than the average person." (*Id.* at 20.) For this reason, plaintiff states that "[i]t is a gross injustice to be accused of taking sick time when [she is] not sick, and furthermore being accused of having a pattern of doing it." (*Id.*; *see also id.* at 35 (stating "some of those 'latenesses' might have been my feeling ill due to fighting off colds, which I happen to be very susceptible to since I was getting colds more often than what would be considered average[,] [b]ut yet they are listed here as latenesses when they very well might have been times feeling sick and having trouble getting up and out to work").)

Plaintiff acknowledges a notice of one-day sick leave in her file, dated January 31, 2008. (*Id.* at 20, 25.) Plaintiff states that this notice "is a complete misrepresentation of the facts AND an example of how [the College was] quick on the trigger to take any time [plaintiff] was out and attribute it to an infraction." (*Id.* at 20.) Plaintiff clarifies that she had requested this day off in order to attend a friend's funeral, and states this request was approved by her supervisor. (*Id.* at 20, 25.)[9]

### 3. Internetting on the Job

Plaintiff states that she received notices of discipline after going on the Internet for interests not related to work, a practice which plaintiff claims she was not alone in doing, but was the only one who received "the threat of stiff penalties" for doing so.

---

[8] It is not clear from plaintiff's allegations whether the January 18 date on which she claimed she was only two minutes late, (Am. Compl. at 33), is the same January 18 date on which she attended her friend's funeral, (*id.* at 32.)

[9] Plaintiff previously alleged that she attended a funeral on a January 18. It is unclear whether the January 30 referenced funeral is a different funeral, or simply a matter of confusion of dates.

(*Id.* at 6 ("[M]ost workers routinely went on the Internet for interests not related to their job performance and the bosses looked away and didn't make anything of it. . . .").)

Plaintiff states that she went on the Internet to access "ordinary, commonplace sites," and that she did not intentionally interfere with or abuse the network. (*Id.* at 28.) Plaintiff also suggests that the College's Internet monitoring equipment might have failed or been inaccurate in assessing when she actually accessed the Internet. (*Id.*) Plaintiff contends that the College's monitoring of her Internet access further exemplifies "how they singled [her] out and discriminated against [her] for doing something that everybody else did." (*Id.*)

4. Supervisor Encounters

Plaintiff notes several problems that she had with her supervisor.[10] Plaintiff generally asserts that she experienced abuse at the hands of a supervisor "who held [her] in very low regard and barely ever spoke to [her]." (*Id.* at 19 ("I had a supervisor who rarely spoke to me, barely tolerated me and who otherwise had a dysfunctional relationship with me – whereas I needed someone who could treat me in a fair and responsive and kind manner.").) Plaintiff offers several examples of this alleged abuse throughout her pleadings.

Plaintiff states that, during her employment, she had an in-person meeting with the head of the IT Department at which he spoke to her in a disrespectful and inappropriate manner. (*Id.* at 26.) Subsequent to this meeting, plaintiff received a memorandum from the head of the IT Department, which plaintiff claims "was filled with inaccuracies and discrepancies and distortions of the truth." (*Id.*) In particular, plaintiff claims the memo accused her of berating an IT worker, texting him, "infecting [her] computer," and claiming she needed the internet in order to make personal travel arrangements. (*Id.*) Plaintiff states that she submitted a reply to this memorandum to correct its inaccuracies, which she admits "was not written in the most respectful manner," and which accused the IT Department head of being inappropriate during the aforementioned meeting. (*Id.*) Plaintiff claims that, on account of her reply, she received "excessive punishment," as well as another Notice of Discipline approximately two days later. (*Id.*)

Plaintiff also includes with her amended complaint a letter, dated June 16, 2011, written by plaintiff's psychologist, Dr. Ira Kalina ("Dr. Kalina"), and addressed "[t]o whom it may concern." (*Id.* at 9.) The letter states that Dr. Kalina has consulted with plaintiff for anxiety, depression, and attention deficit disorder. (*Id.*) Dr. Kalina describes plaintiff's symptoms as "fear of separation and rejection, low self-esteem, and obsessive thoughts and compulsive behaviors." (*Id.*) According to Dr. Kalina, these symptoms worsen when plaintiff experiences threat, making her "stubborn, unyielding and sometimes has [sic] difficulty following basic rules and requirements of others particularly in work and social situations." (*Id.*) The letter requests that plaintiff's condition be kept in mind when "making decisions in her case," and stresses that a loss of plaintiff's job might set her back in her recovery. (*Id.*) Plaintiff claims that she brought this letter to Human Resources, but was told by Marybeth Incandela ("Marybeth") – who,

---
[10] It is not clear from plaintiff's amended complaint whether she is referring to the same or different supervisors during the course of her employment. As it does not affect the Court's legal analysis of plaintiff's claims, the Court need not resolve this issue.

5

based on plaintiff's pleadings, appears to have been her main supervisor – "I'm not connecting the dots of how this applies to this situation." (*Id.*)

### 5. The Coffee Maker, Toaster Oven, and Suspension

Plaintiff references an incident in which the acting fire marshal took away her toaster oven and hotplate (also referred to as a coffee warmer), (*id.* at 38), after she had been advised to remove such from her office, (*id.* at 39.) Plaintiff concedes that she emailed the fire marshal, but clarifies that she "was in no way threatening to him." (*Id.*) She also alleges that the removal of these items caused her to become very upset and threw off her entire schedule, as she was unable to have her "calming tea available to [her] throughout the day." (*Id.*)

Plaintiff states that an interview with the acting fire marshal presented a distorted picture of events. (*Id.* at 39.) Regarding the coffee warmer/hotplate, plaintiff states she was only informed on one occasion to remove it, but only to the kitchen, and not altogether from the premises. (*Id.* (stating defendants "claim[] that I was told several (or five or six to be exact) times to remove the coffee warmer – and that is false; I was told only once").) Plaintiff further claims that one day when she went to use her coffee warmer/hotplate in the kitchen area (having moved it, as requested), she discovered that it was not working properly and saw that its extension cord had been severed, as if with a scissor or razor. (*Id.* at 40.) Plaintiff does not know by whom.

Regarding the toaster oven, plaintiff states that she had been using a toaster oven that belonged to someone else for approximately two years; that individual then moved to another building and took the toaster along. (*Id.* at 39.) One of plaintiff's co-workers did not want her to bring a new toaster to work, for reasons unknown. (*Id.*) Despite this, plaintiff brought a new toaster to work, placing it in the kitchen. (*Id.*) Approximately one week later, plaintiff came to work and that same co-worker accused her of leaving the toaster oven on all night. (*Id.*) Plaintiff states that this was a false allegation. (*Id.*) Moreover, she states that it was not possible to leave the toaster on for that long a period as it had a timer that clicked it off after it had been on for some time. (*Id.*) Plaintiff says that the co-worker was not held accountable for his false accusations, and further suggests that he was the one turning on the toaster to try and frame her. (*Id.*) Plaintiff states that she tried to speak with her supervisor regarding the toaster incident, but to no avail. (*Id.* at 40.) Plaintiff states that she met with her supervisor, who said she would meet with the co-worker; plaintiff believes this never happened. (*Id.*)

Plaintiff states that subsequent to the hotplate/coffee warmer and toaster oven incidents, things worsened for her at work. Plaintiff alleges that she was suspended on account of her "bringing a little innocuous coffee warmer into [the] work kitchen." (*Id.* at 41.) Plaintiff states that she did not deserve to be suspended on account of the hotplate matter, and that this was an "incidental thing . . . other than knowing that [she] could not use the internet or come in late to work or back from lunch late." (*Id.*) Plaintiff additionally notes that she needed the coffee warmer to help keep her tea warm, which calmed her nerves and helped her anxiety. (*Id.*) For these reasons, she states that her suspension was arbitrary and capricious. (*Id.*)

### 6. Yoga

Plaintiff states that after being "suspended for the pettiest of reasons,"

plaintiff was "in a state where [her] head was spinning." (*Id.* at 13.) Plaintiff describes herself as being in a state of shock; she emphasizes that she did not commit "insubordination," but went to the computer lab to try and be constructive during the remaining part of her work day. (*Id.* at 43.) Plaintiff makes clear that she did not try to return to her work station, desk, or even department following news of her suspension. She "was not hurting anyone or disturbing anyone." (*Id.*)

Plaintiff states that she returned to campus two days later, not "out of any maliciousness or misconduct," but "to attend a calming yoga class so as to help alleviate my tremendous high anxiety over being unfairly and inappropriately suspended from being able to come to work as always." (*Id.* at 13.) Plaintiff alleges that, this conduct, coupled with her prior history, caused the College to begin termination proceedings against her. (*Id.*)

Specifically, plaintiff states that she returned to campus on May 18 to attend a yoga class – the same class she had been attending for approximately four years on a weekly basis. (*Id.* at 43.)[11] Plaintiff says she "desperately needed something to calm [her] nerves in light of the ongoing suspension." (*Id.*) Plaintiff was arrested that same day. (*Id.*) Plaintiff asserts that her arrest is just another example of how the College used her work record against her. (*Id.* at 44.) Further, plaintiff states that defendant's contention that she parked off campus and disguised her appearance to avoid being detected on the yoga date in question is false; she parked off campus so as not to run into her co-workers and was wearing no disguise. (*Id.* at 48.)

7. Settlements[12]

Plaintiff refers to a stipulation of settlement, which resolved a Notice of Discipline that she received on February 6, 2008. (*Id.* at 23.) Plaintiff states that defendant should not be able to use this as an exhibit against her if it truly constituted a settlement. (*Id.* at 23.) She further argues that she had wanted her union to fight harder for her to try and have the monetary charges against her either reduced or eliminated. (*Id.*) Plaintiff makes the same allegation as to a Notice of Discipline served on September 30, 2010. (*Id.* at 30.)

Plaintiff also references a "last chance" settlement that she entered into presumably around the time of her suspension. At the time of the agreement, plaintiff states that she did not understand that she had been put back on probation; that she believed this probation was "another example of the College and management coming down on [her] for at times petty reasons"; and that she understood the "last chance settlement" as "how [her] union was helping [her] to avoid the high fines threatened by the College against [her]." (*Id.* at 12.) Plaintiff further states that she did not understand that a two-week suspension would be held in abeyance, but put into effect should she be tardy or go on the internet. (*Id.* at 31.)[13] Plaintiff states

---

[11] From plaintiff's allegations, it may be inferred that her attendance of the May 18 yoga class was during the period of her two-week suspension. (*See* Am. Compl. at 43.)

[12] The dates and chronological order of these settlements is not clear from the record. It also is not clear if plaintiff, at times, references the same settlement in different sections of her amended complaint, or if she in fact is referring to the same settlement.

[13] Confusingly, in her opposition motion, plaintiff states that "I actually did understand that a two-week suspension was being held in abeyance . . . etc. because that was precisely what caused me to improve my behavior and habits in relation to improving my tardiness and eliminating my going on

that she "ABSOLUTELY DID NOT COMPREHEND OR UNDERSTAND THAT I WAS BEING PLACED ON PROBATION." (*Id.*) Plaintiff also states that she only was informed of the two-week suspension, and not of any possible termination. (*Id.*)

Plaintiff references an agreement that she claims she signed "under duress and without competent representation," which had the effect of taking away her rights and leaving her "unfairly vulnerable – but which still never mentioned in it [her] getting terminated." (*Id.* at 7.) The Court understands this agreement to have occurred at the time of her suspension, but before her termination.

Plaintiff also refers to an agreement with the College that provided that a penalty of $250 would be held in abeyance if she visited the Employee Assistance Program during the remaining time of her employment. (*Id.* at 36.) It is not clear if this is the same "last chance" settlement to which plaintiff previously referred. Regarding this agreement, plaintiff alleges that she held up her end of the bargain, and therefore, was confused as to why she was then suspended and terminated from her employment. (*Id.*) Plaintiff asserts that she did not understand the terms of this agreement, despite having signed to the contrary. (*Id.*) Plaintiff states that she simply signed the agreement "to get myself out of trouble and get back to work . . . just to get on with my job and stop being [sic] persecuted in the manner that I was." (*Id.*) Plaintiff also explains that she signed the agreement because she did not want to be singled out or further harassed at her employment. (*Id.* at 37.)

---

the computer. So that was a major mistake to state that I did not understand this." (Pl.'s Opp'n Mot. at 4.)

Plaintiff claims that the College denies having terminated her, instead stating she, in plaintiff's words, "resigned via the settlement agreement." (*Id.* at 13.) Plaintiff disputes this, asserting that she was "coerced and pressured into taking that agreement." (*Id.*) Plaintiff also reiterates that she was regularly misunderstood while on campus, held to a different standard than other employees, and that she was "bullied and treated as though [she] were committing heinous crimes," even when her actions were "innocuous and innocent." (*Id.* at 13-14.)

8. Termination

While the exact timeline of events is not clear from the record, what is clear is that, at some point, plaintiff was terminated from her employment. Plaintiff states that following her two-week suspension over the coffee warmer/hotplate incident, she sent an angry email to Human Resources (specifically, Marybeth), that could have been ignored, "understanding that it was just coming from a person who was very much in a very riled-up state." (*Id.* at 42.)

Following the yoga incident, plaintiff signed an agreement. (*Id.* at 45.) Plaintiff says she had already learned that she was going to be terminated, had no income, and was scared as to how she was going to support herself. (*Id.*) She signed the agreement in a state of duress, and was subsequently terminated. (*Id.* at 45-46.)

Plaintiff asserts that termination was not necessary because she could have been placed on a leave of absence, which would have allowed her to retain her status as a state civil service worker while canvassing for other jobs. (*Id.* at 7.) It seems that, after her termination, plaintiff decided to seek legal assistance. (*Id.* at 7.) This proved fruitful for plaintiff, apparently leading to a

settlement which she "accepted due to being in a very desperate place with absolutely no money coming in." (*Id.* at 7.)[14] Subsequently, an Administrative Law Judge ("ALJ") granted her unemployment insurance after holding a hearing in which the ALJ concluded that plaintiff's acts – specifically, the hotplate/coffee warmer, toaster, and yoga incidents – did not constitute insubordination or misconduct, but poor judgment. (*Id.*)

### 9. Accommodations

Regarding her initial application for her job position, plaintiff acknowledges that she "stated on my application that I did not indicate that I needed further and reasonable accommodation." (*Id.* at 48-49.) Plaintiff explains that she made this representation to try and put her best foot forward in her job application, and further, because she was "in denial of how much trouble [she] would have working; and only upon starting the job and seeing that I had trouble did I know and fully realize it." (*Id.* at 49.) Plaintiff goes on to assert throughout her pleadings that the College should have considered making accommodations for her during her employment on account of her disability.

For instance, plaintiff states that, although the College denies treating her "in a manner benefitting her alleged emotional condition," this is not so; the College, according to plaintiff, regularly accused her of "misusing time," whether her lunch breaks or her sick leave. (*Id.* at 14.) Plaintiff states that her acts could have been remedied by reasonable accommodation, but none were offered. (*Id.*) Rather, the College "just continued to bring charges against [her]." (*Id.*)

Plaintiff then concedes that there was an occasion on which the College approached her to offer an accommodation, but admits that she "let it got and [did] not follow up on it." (*Id.* at 14; *see also id.* at 49-50 (describing exhibits from Marybeth in Human Resources in which the latter tried to demonstrate how she had tried to help accommodate plaintiff); *id.* at 50 (acknowledging Marybeth's offer of accommodation and stating "[l]ooking back, I should have taken that opportunity to deal with [Marybeth] and take advantage of her stance[,] [b]ut I get very overwhelmed with my work schedule and don't get to things oftentimes").)

Plaintiff also received a letter from Human Resources regarding an accommodation; it is unclear whether this is the same accommodation that plaintiff references above or whether it is a different one. (*Id.* at 51-52.) Additionally, plaintiff received a phone call from Marybeth; Marybeth rejected the idea of plaintiff working later on days when she came in late on the grounds that there needed to be a fixed schedule. (*Id.* at 52.) Marybeth did, however, offer plaintiff a reduced work schedule; plaintiff was reluctant to accept this, though, because she "was deathly afraid that I would not be able to support myself." (*Id.*) Again, it is unclear from the record if the reduced working schedule is the same accommodation to which plaintiff makes reference above.

Plaintiff concedes that she did not call Marybeth following the reduced schedule proposal, stating she did not know what to ask for and that she simply got caught up in life. (*Id.*) Plaintiff says that around this time period, she "did buckle down and start improving at [her] job and managing to

---

[14] According to plaintiff, she obtained "one very good firm [that] came to the conclusion that Farmingdale State College committed a breach of contract in denying [her], and not letting things go to, *binding arbitration*," which ultimately resulted in a settlement. (Am. Compl. at 7.)

come in on time and stick to [her] schedule." (*Id*.) Plaintiff states that the "hotplate occurrence," coupled with the yoga incident," "ruined things" for her at work, but that she then began to improve her attendance record. (*Id.* at 53.) Plaintiff suggests that she might not have continued to reach out to Marybeth simply because she no longer saw "the need to have any more thought to the accommodation issue." (*Id.*)

Plaintiff states that she could have made several proposals to help improve matters with her employer, including suggesting that she no longer be required to email her supervisor four times a day, instead working out lateness matters in a different manner. (*Id.* at 51.) Plaintiff also acknowledges that she might have been "in denial" as to how much accommodation she might need. (*Id.*) Plaintiff states she "think [she] meant to contact [Marybeth] about [the accommodation] and just kind of put it off. As I look back now, that was a big mistake." (*Id.*)

All in all, plaintiff states that the College should have made a greater effort to accommodate her disabilities. (*Id.*) In particular, plaintiff states that she should have had the option of being placed on an unpaid leave of absence so that she could look for other jobs while still maintaining her "state civil service worker" status. (*Id.* at 18.) By not doing this, "it cut off all chances of being approached by other agencies due to the fact that it took me off the roles of the eligible lists. . . . [I]nstead of the route they wound up taking which resulted in my being and remaining cut off from the ranks of civil service work ad infinitum until I would go through all the tedious steps of applying to take a test [to obtain civil service worker status] all over again." (*Id.*)

\* \* \*

For these foregoing reasons, plaintiff seeks relief "as may be appropriate, including injunctive orders, damages, costs, and attorney's fees." (*Id.* at 5.) Plaintiff also states that she is seeking reinstatement at her job, or alternatively, a leave of absence from it so that she may continue looking for other employment. (*Id.* at 53-54.)

B. Procedural History

Plaintiff initially filed her complaint with this Court against the College, EEOC, and the NYSDHR on April 6, 2012. By Order dated May 3, 2013, plaintiff's complaint was *sua sponte* dismissed against the NYSDHR and the EEOC, with prejudice pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(iii), and the College, without prejudice pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii). Specifically, the Court held that plaintiff's *pro se* complaint failed to meet Rule 8 of the Federal Rules of Civil Procedure's pleading standards, as plaintiff did not identify her claimed disability, nor did she provide sufficient factual allegations from which the Court might liberally construe a plausible disability discrimination and/or retaliation claim against either the EEOC or NYSDHR (the administrative agencies with which she initially filed her discrimination charges, but neither of which were her actual employer). *See* Order, *Sherry Buch v. Farmingdale State College, NYS Div. of Human Rights, Equal Employ't Opportunity Comm'n*, 12-CV-1762(JFB)(ETB), (E.D.N.Y. May 3, 2012), ECF. No. 5.

Plaintiff then filed an amended complaint against the College on May 18, 2012. On August 13, 2012, defendant filed its motion to dismiss for lack of jurisdiction and for failure to state a cause of action. On September 14, 2012, plaintiff submitted her opposition to defendant's motion to dismiss. On September 28, 2012, defendant filed its

10

reply. The Court has fully considered the parties' submissions.

## II. STANDARD OF REVIEW

Rule 8 of the Federal Rules of Civil Procedure states that pleadings must present "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512 (2002). Pleadings are to give "fair notice of what the plaintiff's claim is and the grounds upon which it rests" in order to enable the opposing party to answer and prepare for trial, and to identify the nature of the case. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957), *overruled in part on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

In this case, the Court is presented with two grounds pursuant to which dismissal may be warranted: Rule 12(b)(1) (lack of subject matter jurisdiction) and Rule 12(b)(6) (failure to state a claim upon which relief may be granted) of the Federal Rules of Civil Procedure. Whereas the former tests a court's authority to adjudicate a case, *see Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000), the latter tests a complaint's legal sufficiency, *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). The Court addresses the standards for each rule in turn.

When reviewing a motion to dismiss under Rule 12(b)(1), the Court "must accept as true all material factual allegations in the complaint, but [it is] not to draw inferences from the complaint favorable to plaintiffs." *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004). The Court is not confined to the four corners of the complaint. That is, the Court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [it] may not rely on conclusory or hearsay statements contained in the affidavits." *Id.* "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005). Although courts hold *pro se* complaints "to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (citation and internal quotation marks omitted), *pro se* litigants still must establish subject matter jurisdiction to proceed in federal court. *See, e.g.*, *Torres v. Dep't of Homeland Sec.*, 441 F. App'x 812, 812 (2d Cir. 2011) (affirming district court's grant of defendant's motion to dismiss *pro se* plaintiff's complaint for lack of subject matter jurisdiction).

When considering whether dismissal is warranted under Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). To ensure a claim's survival, a complaint must set forth "a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555); *see also Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (explaining that a plaintiff must satisfy a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*"). Generally, to survive a motion to dismiss, a complaint need not provide "heightened fact pleading of specifics, but

only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

This standard is especially true when a case involves a *pro se* plaintiff. The Second Circuit emphasized in *Sealed Plaintiff v. Sealed Defendant* that "[o]n occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, . . . a court is obliged to construe his pleadings liberally. . . . Accordingly, the dismissal of a *pro se* claim as insufficiently pleaded is appropriate only in the most unsustainable of cases." 537 F.3d 185, 191 (2d Cir. 2008) (alteration in original) (internal citations and internal quotation marks omitted); *see also Weixel v. Bd. of Educ. of the City of N.Y.*, 287 F.3d 138, 145-46 (2d Cir. 2002) (holding that when plaintiff is appearing *pro se*, the court shall "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." (quoting *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000)) (alterations in original) (internal quotation mark omitted)).

Where a motion to dismiss presents itself before the court, a court testing the waters of dismissal may examine the following: "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *Nasso v. Bio Reference Labs., Inc.*, No. 11-CV-3480 (JFB)(ETB), 2012 WL 4336429, at *3 (quoting *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (internal citations omitted)).

### III. DISCUSSION

A. Lack of Subject Matter Jurisdiction

The College asserts that dismissal of plaintiff's claims is warranted because the Eleventh Amendment shields the College from liability under Title I of the ADA. (Def.'s Mem. of Law in Supp. of Mot. to Dismiss at 9-11.) For the reasons set forth below, the Court agrees with the College.

The Eleventh Amendment states that the "[j]udicial power of the United States shall not be construed to extend to any suit . . . commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Thus, the Eleventh Amendment bars federal suits against state governments by a state's citizens, unless that state "waive[s] its . . . immunity from suit in a federal court," *Lapides v. Bd. of Regents of Univ. of Ga.*, 535 U.S. 613, 618 (2002), or Congress "abrogate[s] such immunity . . . [by] mak[ing] its intention to abrogate unmistakably clear in the language of [a federal] statute and acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment." *Nev. Dep't. of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003).

New York "has not waived its immunity as to suits seeking either monetary or injunctive relief in federal court." *Goonewardena v. New York*, 475 F. Supp. 2d. 310, 322 (S.D.N.Y. 2007) (citing N.Y. Court of Claims Act § 8 (McKinney 2006)). Additionally, the Supreme Court has held

that Title I of the ADA does not abrogate states' Eleventh Amendment immunity. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 & n.1 (2001); *see also Darcy v. Lippman*, 356 F. App'x 434, 436 (2d Cir. 2009) (noting that abrogation of state sovereign immunity under the Eleventh Amendment cannot occur under Title I of the ADA). Thus, the two avenues pursuant to which state immunity might be lifted are not present in this case. *See Poole v. New York*, No. 11-CV-921 (JFB)(AKT), 2012 WL 727206, at *4 (E.D.N.Y. Mar. 6, 2012) (stating "absent a state's consent to suit or an express statutory waiver, the Eleventh Amendment bars federal court claims against states").

Although no specific state is expressly named in this action, "[i]t has long been settled that the reference to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997). For instance, if an action essentially seeks recovery of money from the state, then in that instance "the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit . . . ." *Id.* (quoting *Ford Motor Co. v. Dep't of Treasury of Ind.*, 323 U.S. 459, 464 (1945)).

In assessing whether a state instrumentality may invoke a state's immunity, courts generally focus on the relationship between that entity and the state to determine whether it, for all intents and purposes, constitutes an "arm of the State." *Id.* at 429-30 (quoting *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)) (internal quotation marks omitted). Here, however, the issue of whether the College constitutes an arm of the state already has been decided by the Second Circuit. The College is part of the State University of New York ("SUNY"), and the Second Circuit has held that "[f]or Eleventh Amendment purposes, SUNY is an integral part of the government of the State [of New York] and when it is sued the State is the real party." *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990) (second alteration in original); *see also Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn*, 280 F.3d 98, 108 (2d Cir. 2001); *Pemrick v. Stracher*, 92 CV 959(CLP), 2007 WL 1876504, at *5 (E.D.N.Y. June 28, 2007) ("SUNY is an agency of the State of New York and thus cannot be sued in federal court absent the State's consent."); *Ettinger v. SUNY Coll. of Optometry*, No. 95-Civ-9893 (RWS), 1998 WL 91089, at *9 (S.D.N.Y. Mar. 2, 1998).

The College's immunity pursuant to the Eleventh Amendment remains intact, regardless of the fact that plaintiff seeks "injunctive orders, damages, costs, and attorney's fees," (Am. Compl. at 5), as the type of relief sought is "irrelevant" to the question of Eleventh Amendment immunity applicability. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 58 (1996) ("[T]he relief sought by a plaintiff suing a State is irrelevant to the question whether the suit is barred by the Eleventh Amendment."). Stated differently, where Eleventh Amendment immunity applies, a plaintiff is precluded "from seeking any relief against state and state agencies – including monetary and injunctive relief." *Hamzik v. Office for People with Developmental Disabilities*, No. 3:11-CV-73, 2012 WL 1701312, at *5 (N.D.N.Y. May 16, 2012) (citing *Cory v. White*, 457 U.S. 85, 90-91 (1982)); *see also Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 765 (2002) (stating "sovereign immunity applies regardless of whether a private plaintiff's

suit is for monetary damages or some other type of relief").

In sum, the case law is clear: the College is entitled to Eleventh Amendment immunity by virtue of its status as an instrument of the state, and due to the fact that neither the College nor statutory law has waived such immunity. *See Darcy*, 356 F. App'x at 436 (stating "[a]brogation of state sovereign immunity is accomplished neither by ADA Title I . . . [n]or is there any suggestion that the state has consented to be sued under [that] statute'"); *see also Dube*, 900 F.2d at 594-95; *Poole*, 2012 WL 727206, at *4. Subject matter jurisdiction is therefore lacking, and without this, the Court has no authority to consider the case before it. *See United States v. Cotton*, 535 U.S. 625, 630 (2002); *Megibow v. Clerk of U.S. Tax Court*, No. 04-Civ. 3321(GEL), 2004 WL 1961591, at *2 (S.D.N.Y. Aug. 31, 2004) ("Subject matter jurisdiction refers to [the court's] authority to hear and determine a case."). "[S]ubject matter jurisdiction is an unwaivable *sine qua non* for the exercise of federal judicial power." *Curley v. Brignoli, Curley & Roberts, Assocs.*, 915 F.2d 81, 83 (2d Cir. 1990). Accordingly, in the absence of such, plaintiff's amended complaint must be dismissed.[15]

## IV. CONCLUSION

For the foregoing reasons, defendant's motion to dismiss plaintiff's amended complaint is granted. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith. Therefore, *in forma pauperis* status is denied for purposes of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962). The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 4, 2013
Central Islip, NY

\* \* \*

Plaintiff is proceeding *pro se*, 2083 Oakmere Drive, Baldwin, NY 11570. The attorney for the defendant is Anne C.

---

[15] Although plaintiff does not allege a claim under Title II of the ADA, the Court has considered whether or not to grant leave to re-plead so that such a claim might be added. The Court concludes that any such leave to re-plead would be futile. In particular, the Court agrees with the well-reasoned and thorough analysis of Judge Karas in *Henny v. New York State*, 842 F. Supp. 2d 530, 545-50 (S.D.N.Y. 2012), as well as the numerous cases cited therein, that Title II does not cover employment discrimination claims.

Alternatively, the Court also agrees with the College that, given plaintiff's admissions in both the amended complaint and accompanying exhibits, plaintiff has not articulated a plausible ADA claim against the College, even if subject matter jurisdiction did exist. Specifically, although plaintiff disputes certain disciplinary infractions, she admits to many of the infractions in her amended complaint. Given these admissions, plaintiff's own allegations do not articulate how she was otherwise qualified to perform the essential functions of her job, with or without a reasonable accommodation.

Similarly, with respect to the retaliation claim, plaintiff has failed to allege that she made any complaints of disability discrimination prior to her termination. Thus, notwithstanding that this is her second complaint, plaintiff has failed to articulate a plausible claim for disability discrimination or retaliation, even if subject matter jurisdiction did exist under Title II. Moreover, there is no indication that she could do so if given an opportunity to re-plead.

Leahey, New York State Attorney General's Office, 300 Motor Parkway, Suite 205, Hauppauge, NY 11788.